1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    DIMITRI DIXON and RYAN SELTZ,            Case No.  18-cv-05813-JSC
     individually, and on behalf of all others
8    similarly situated,
                                              **ORDER RE: MOTION FOR**
9                  Plaintiffs,                **PRELIMINARY APPROVAL**

10          v.                                Re: Dkt. No. 114

11   CUSHMAN & WAKEFIELD WESTERN,
     INC., et al.,
12
                   Defendants.
13

14          In this wage and hour lawsuit, Plaintiffs allege that Cushman & Wakefield Western, Inc.

15   unlawfully denied appraiser and senior appraiser employees guaranteed wage and overtime

16   compensation due to their misclassification as exempt employees under California wage and hour

17   laws, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.[1]  The parties in *Dixon* have

18   reached a global settlement which resolves three cases that are being combined into one amended

19   complaint in the instant case for settlement purposes: (1) *Dixon v. Cushman & Wakefield Western,*

20   *Inc.*, Case No. 3:18-cv-05813-JSC (N.D. Cal.) ("*Dixon I*"); (2) *Dixon v. Cushman & Wakefield, Inc.*,

21   Case No. 3:20-cv-07001-JSC (N.D. Cal.) ("*Dixon II*"); and (3) *Seltz v. Cushman & Wakefield, Inc.*,

22   Case No. 1:18-cv-02092-BAH (D. D.C.) ("*Seltz*"). Plaintiffs' unopposed motion for preliminary

23   approval of the class and collective settlement is now pending before the Court. (Dkt. No. 114.[2])

24   Following receipt of the motion, the Court requested supplemental briefing.  (Dkt. No. 126.)   Having

25   considered the motion, including Plaintiffs' supplemental submission, the Court concludes that oral

26

27   _____

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
     636(c). (Dkt. Nos. 9, 10, 131, 132, 133.)
28   [2] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the document.

argument is unnecessary, *see* Civ. L.R. 7-1(b), VACATES the September 2, 2021 hearing, and GRANTS the motion for preliminary approval.

**BACKGROUND**

**I.     The Parties**

Cushman & Wakefield is a commercial real estate services company.  (Dkt. No. 113 at ¶ 12.) Cushman & Wakefield is the parent corporation of Defendants Cushman & Wakefield Western and Cushman & Wakefield DC. (collectively "Cushman"), and together they employ Appraisers (including Junior Appraisers and Senior Appraisers) like Plaintiffs.  (*Id*.)

Plaintiff Dimitri Dixon resides in Tustin, California and was employed as an Appraiser Trainee by Cushman and worked in that capacity from September 2007 to December 10, 2018.  (*Id*. at ¶ 10.) Plaintiff Ryan Seltz resided in Washington DC during his employment as an Appraiser with Cushman from May 2017 to October 2017. (*Id*. at ¶ 11.)

**II.     Complaint Allegations**

Dixon began working for Cushman in September 2017.  (*Id*. at ¶ 13.) As an Appraiser Trainee, her duties "included appraising the value of real estate investments, researching property sales, listings, and rentals, constructing financial models, researching financial information, preparing appraisals for firm clients, and inspecting property." (*Id*.)  Dixon worked in several practice areas during her employment with Cushman's Valuation Advisory Group.  (*Id*. at ¶ 14.)  Although Dixon had an Appraiser Trainee license, she repeatedly sought a state-certified appraisal license during her tenure with Cushman. (*Id*. at ¶ 15.)

Dixon was compensated through a "recoverable draw" scheme which operated as follows:

> At the beginning of each year of her employment, Plaintiff Dixon was required to sign a standard promissory note with C&W and C&W Western, where she agreed to pay C&W and C&W Western the balance of a fixed sum of money equal to her annual compensation. Each employee then receives a bi-monthly draw against this obligation, which is the sole basis of compensation. Such "draw" payments constitute advancements to Plaintiff Dixon, which Plaintiff owes to C&W and C&W Western in the form of debt. The promissory note allows C&W and C&W Western, among other things, to recoup the entire balance of the advanced sum at any time, including after the employee-employer relationship terminates.

(*Id*. at ¶ 16.)  Appraisers are assigned to projects which generate fees and these fees are intended, at

2

least in part, to cover their bimonthly draw payments and any outstanding debt obligations.  (*Id.* at ¶ 17.)  However, a portion of these fees are "set aside for C&W and C&W Western to account for and offset various accrued expenses and costs, including referral fees, supervisory offsets and other miscellaneous costs." (*Id.*)  Dixon alleges that beginning around June 2013 her fees were significantly reduced due to "supervisory offsets."  (*Id.*)

On a monthly basis, the draw payments are deducted from the fees collected with positive amounts paid to the employee and negative amounts carried forward as a debt owed to Cushman.  (*Id.* at ¶ 18.)  Dixon consistently carried forward a deficient while working for Cushman. (*Id.* at ¶ 20.)  In 2017, Cushman's promissory note against Dixon was $54,000—which was equal to her bi-monthly draw payments throughout the year.  (*Id.* at ¶ 21.)  By December 2017, Dixon was only receiving fifty percent of the fees generated and alerted her supervisors that the fee split (with the supervisor fees) precluded her from satisfying her outstanding debt obligations. (*Id.* at ¶ 22.)

In May 2018, Dixon was advised that her recoverable draw compensation would be reduced from $54,000 to $45,760 because she had not performed enough work to settle the deficit owed.  (*Id.* at ¶ 25.)  Dixon spoke to her supervisor who advised her that Cushman did not have work that she could perform. (*Id.* at ¶ 27.)  In June, her draw payments stopped.  (*Id.* at ¶ 28.)  In April 2019, Dixon was notified of her termination effective December 2018.  Cushman alleged that she owed a draw balance of more than $15,000 and demanded repayment. (*Id.* at ¶ 31.)

During the class period, Dixon regularly worked more than 8 hours a day and more than 40 hours per week, but was not paid for her excess work. (*Id.* at ¶ 32.)  Dixon was also not provided meal and rest periods, accurate itemized wage statements, or all wages due at the time of termination.  (*Id.* at ¶¶ 33-37.)

During the time Plaintiff Seltz worked as an Appraiser in Washington DC, he regularly worked more than 40 hours per week without being paid overtime.  (*Id.* at ¶ 39.)

**III.  The Settlement Agreement**

    **A. The Class**

Following settlement, Plaintiffs filed a Second Amended Complaint which added Plaintiff Ryan Seltz to *Dixon I*, added Cushman and Wakefield, Inc. and Cushman and Wakefield of

United States District Court
Northern District of California

Washington, DC, Inc. as Defendants, and amended the class definition to include Junior Appraisers in California and the collective definition to include Junior Appraisers and Appraisers who worked outside of California.  (Dkt. No. 115 at ¶ 10; Dkt. No. 113, Second Amended Complaint ("SAC").)

**1) FLSA Collective**

Pursuant to 29 U.S.C. § 216, Plaintiffs seek to prosecute the FLSA claims as a collective action on behalf of two groups of Appraisers.  (*Id*. at ¶¶ 41-42.)   Conditional certification of these collectives was granted in November 2020.  (Dkt. No. 115 at ¶ 8.)

Plaintiff Dixon represents the following collective of Appraisers:

> All persons employed by CUSHMAN AND WAKEFIELD WESTERN, INC. and CUSHMAN AND WAKEFIELD, INC., as Appraisers (including and Senior Appraisers) assigned to at least one Cushman & Wakefield office in any state between October 7, 2017 through May 31, 2021 ("*Dixon* Collective").

(Dkt. No. 113, SAC at ¶ 41.)

Plaintiff Seltz represents the following collective of Junior Appraisers:

> All persons employed by CUSHMAN AND WAKEFIELD, INC., and CUSHMAN AND WAKEFIELD, OF WASHINGTON, DC, INC. as Junior Appraisers or Associate Appraisers assigned to at least one Cushman &Wakefield office in any state between October 12, 2016 through September 9, 2019 ("*Seltz* Collective").

(*Id.* at ¶ 42.)

**2) California Class**

Plaintiff Dixon seeks to represent a Rule 23 class of the following:

> All persons employed in California by CUSHMAN AND WAKEFIELD WESTERN, INC., and CUSHMAN AND WAKEFIELD, INC., as an Appraiser (including Junior Appraisers and Senior Appraisers) assigned to at least one Cushman & Wakefield office between August 14, 2014 through May 31, 2021 ("California Class Action Members").

(*Id.* at ¶ 49.)

**B. Payment Terms**

The $4,900,000 common fund will be allocated as follows:

1. Up to approximately $3,134,666.67 ("Net Settlement Fund,") to be used to pay

individual settlement awards for each participating settlement class member under the following formula (Dkt. No. 115-1, Settlement Agreement at § 2.8(f)):

    a.   One point for each Non-California Opt-in Eligible Plaintiff (i.e. individuals who are eligible to opt into the FLSA claims and received a notice of the collective actions prior to the settlement but chose not to opt-in) workweek;

    b.   Two points for each *Seltz* Opt-in Plaintiff (i.e. individuals who opted into the *Seltz* FLSA claim) and *Dixon II* Opt-in Plaintiff (i.e. individuals who opted into the *Dixon II* FLSA claim) workweek;

    c.   Three points for each California Class Member (i.e. individuals who worked for Defendants in California but did not opt into the *Dixon I* FLSA action) workweek; and,

    d.   Four points for each *Dixon I* Opt-in Plaintiff (i.e. individuals who both worked in California and opted into the *Dixon I* FLSA action) workweek.

2. Each California Class Member's individual payment will be allocated one-third to wages, two-thirds to non-wages (*Id.* § 2.8(g)), and all other Participating Claimants' individual payments will be allocated half to wages and half to nonwages (*Id.* § 2.8(g)).

3. All California Class Members and *Dixon II* and *Seltz* Opt-in Plaintiffs will be mailed a check (with no claim forms required) except those California Class Members who affirmatively opt out. (*Id.* § 2.5(a).) Non-California Opt-in Eligible Plaintiffs will receive a claim form with their notice of settlement. (*Id.* § 2.5(f));

4. Defendants will not be responsible for paying the amount of the Net Settlement Fund equal to the combined Individual Payment Amounts for the Non-California Opt-in Eligible Plaintiffs who do not opt into the settlement. (*Id.* § 2.8(a));

5. Any uncashed checks 180 days after the initial mailing will be voided and distributed as follows:

    a.   California Class Members' uncashed checks will be sent to the Controller of the State of California in the name of the California Class Member and held

1   under the Unclaimed Property Law; (*Id.* § 2.8(i)(1));

2       b.  Uncashed checks by Non-California Opt-in Eligible Plaintiffs who timely

3   submitted consent to join forms will be sent to a *cy pres* beneficiary

4   mutually agreed upon by the Parties and approved by the Court; (*Id.* §

5   2.8(i)(2));

6       c.  Uncashed checks by *Dixon II* Opt-in Plaintiffs and *Seltz* Opt-in Plaintiffs

7   will be deposited into Plaintiffs' Counsel's client trust account and held

8   until the Plaintiff can be located (*Id.* § 2.8(i)(3));

9     6.  $20,000 to the California Labor Agency ("LWDA") for the State of California's

10   share of the $26,666.67 allocation of the fund for PAGA penalties (*Id.* § 2.8(h));

11       a.  25% of the PAGA allocation ($26,666.67), equal to $6,666.67, will be split

12   pro rata among California Class Members who worked on or after August

13   14, 2017 (*Id.* § 2.8(h));

14     7.  Service awards to Named Plaintiffs ($10,000 each to Plaintiffs Dixon and Seltz)

15   and Declarants ($2,000 each to Benjamin Blake, Eric Hix, Katherine Pierno, John

16   Dickerson, Heather Elliot, and Teresa Simone) (*Id.* § 2.8(e));

17     8.  Settlement administration costs no greater than $20,000 (*Id.* § 2.8(e));

18     9.  The payment of one-third of the common fund, or $1,633,333.33, as attorneys' fees

19   (*Id.* § 2.8(d));

20     10. Reimbursement of actual litigation costs of not more than $60,000 (*Id.* § 2.8(d)).

21   **C. Scope of Release**

22   The California Class Members (except any who opt out of the settlement) will release

23   claims that were asserted or could have been brought based on the facts alleged in the Second

24   Amended Complaint related to Defendants' misclassification of California Class Members as

25   exempt from California and federal overtime laws. (*Id.* at § 4.1.)  No California Class Members

26   may opt out of the release of PAGA claims.  (*Id.*) Opt-ins and Non-California Eligible Opt-ins

27   who submit a claim form will release claims that were asserted or could have been brought based

28   on the facts alleged in the Second Amended Complaint related to Defendants' misclassification of

United States District Court
Northern District of California

Opt-in Plaintiffs and Non-California Eligible Opt-ins as exempt from federal and state overtime laws.  (*Id*.)  In contrast, Non-California Eligible Opt-ins who do not opt into the FLSA action do not release any claims against Defendants.  (*Id*. § 2.5(f).)  Both named Plaintiffs will sign a general release of claims in exchange for their service award.  (*Id*. § 2.8(e).)

**D. Notice**

Within 15 days of preliminary approval, Cushman will provide the Settlement Administrator with the confidential Class List.  (*Id*. § 2.3(a).)   Within 14 days after receipt of the Class List, the Settlement Administrator, CPT, will send out one of three notices by mail or, if available, email: (1) to California Class Members, a Notice of Class, Collective, and Representative Action Settlement; (2) to Non-California Opt-in Eligible Plaintiffs the Notice of Collective Action Settlement and Opportunity to Join and the Claim Form; and (3) to the *Dixon II* and *Seltz* Opt-in Plaintiffs the Notice of Collection Action Settlement.  (*Id*. § 2.3(b); Dkt. No. 129-2, Exs. B, C, D.)  The Settlement Administrator shall perform a national change of address database review prior to mailing. If any Notice is returned as undeliverable, the Settlement Administrator shall promptly notify Plaintiffs' Counsel and attempt to locate such employee through one skip trace and, if a new address is identified, shall promptly mail an additional Notice to such person. In the case of any employee who is known to be deceased, the Settlement Administrator shall mail the employee's Notice to the legal representative of the estate. (Dkt. No. 115-1 at § 2.3(b).)

The Notices shall include the dates that the employee worked during the applicable time periods in the respective positions as indicated in Cushman's records and the estimated minimum Individual Payment Amount based on the formula outlined above.  (*Id*. at § 2.3(c); Dkt. No. 129-2, Exs. B, C, D.)  In addition, the Notices describe the litigation, the terms of the Settlement, and the options available according to the type of employee receiving the Notice with respect to participating in the Settlement.  The Notices also contain information about a website created and maintained by the Settlement Administrator.  (Dkt. No. 115-1 at § 2.3(d).)

**E. Opt-Outs and Objections**

Any California Class Member can object or opt out within 60 days of the notice mailing.

(*Id*. § 2.5(a).)  California Class Members who do not timely opt out will be members of the Class for settlement purposes, and will release the claims asserted in the lawsuit, as well as any claims that could have been asserted based upon the facts alleged in the complaint.  (*Id*.)  Class members who affirmatively opt out will not receive a settlement payment, but also will not be subject to any release of claims. (*Id*. §§ 2.5(a), 4.1.)

The Non-California Opt-In Eligible Plaintiffs may either participate in the Settlement by submitting a Claim Form within 60 days or decline to participate in the Settlement by not submitting a Claim Form. (*Id*. § 2.5.)  Non-California Opt-In Eligible Plaintiffs may not request exclusion or object to the Settlement.  (*Id*. § 2.5(f).)

The *Dixon II* and *Seltz* Opt-ins have already chosen to participate in the case, so may not opt out or request exclusion. (*Id.* § 4.1.)

## DISCUSSION

A class action settlement agreement must be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). Where, as here, parties reach an agreement before class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co*., 327 F.3d 938, 952 (9th Cir. 2003). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co*., No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

Similarly, court approval is generally required for settlement of FLSA collective actions. *See Camilo v. Ozuna*, No. 18-cv-02842-VKD, 2019 WL 2141970, at *6 (N.D. Cal. May 16, 2019). However, Rule 23 class actions and FLSA collective actions are different proceedings that "impose distinct requirements." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101 (9th Cir. 2018) (noting that class actions and FLSA collective actions "are creatures of distinct texts— collective actions of [29 U.S.C. § 216(b)] and class actions of Rule 23—that impose distinct requirements"). This is because conditional certification of a collective action under the FLSA— unlike conditional certification of a class action under Rule 23—"plays no ... gatekeeping role"

and "does not produce a class with an independent legal status or join additional parties to the action" who must then opt out of the suit. *Id.* (internal quotation marks, alterations, and citation omitted). Instead, putative members of an FLSA collective action must affirmatively opt-in and consent to be bound by a final judgment in the action. *See id.* at 1101, 1105 ("The sole consequence of a successful motion for preliminary certification is the sending of court-approved written notice to workers who may wish to join the litigation as individuals.") (internal quotation marks and citation omitted).

Thus, the Court addresses conditional certification of the class action and FLSA collective action separately.

## I. Conditional Certification of the Settlement Class

Class actions must meet the following requirements for certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to meeting the requirements of Rule 23(a), a putative class action must also meet one of the conditions outlined in Rule 23(b)—as relevant here, the condition that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Prior to certifying the class, the Court must determine whether Plaintiff Dixon has satisfied her burden of demonstrating that the proposed class satisfies each element of Rule 23.

### A. Rule 23(a)

The Rule 23(a) factors are satisfied. First, the "total number of Settlement Class/Collective Members is 476 – there are 111 California Settlement Class Members and 367 Non-California Settlement Collective Members." (Dkt. No. 129 at ¶ 2.) The putative class of 111 thus satisfies the numerosity requirement. *See Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012) ("While there is no fixed number that satisfies the numerosity requirement, as a general

United States District Court
Northern District of California

1   matter, a class greater than forty often satisfies the requirement, while one less than twenty-one

2   does not.").

3          Second, the typicality requirement is similarly satisfied.  "Dixon worked as an Appraiser

4   and alleges that she was misclassified as exempt from FLSA and California Labor Code's

5   overtime protections, received compensation in the form of a recoverable draw, often worked

6   more than eight hours per day and forty hours per week, was not provided meal and rest periods,

7   was not provided accurate itemized wage statements, was not paid all wages due twice per month

8   or upon termination, and was not reimbursed for all reasonable business expenses."  (Dkt. No. 115

9   at ¶ 20.)  Plaintiff's claims challenge a course of conduct that applied to all putative class

10  members, and thus, all members suffered the same or similar injury. *See Hanon v. Dataproducts*

11  *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("The test of typicality is whether other members have

12  the same or similar injury, whether the action is based on conduct which is not unique to the

13  named plaintiffs, and whether other class members have been injured by the same course of

14  conduct."); *see also Bellinghausen*, 303 F.R.D. at 617 (finding the typicality requirement satisfied

15  because the named plaintiff "allege[d] that he, like the other class members, worked for

16  [d]efendant in California during the class period and was subject to the same wage-and-hour

17  policies and procedures at issue in [the] litigation").

18         Third, the commonality requirement is satisfied because there are common questions of

19  law and fact arising out of Cushman's allegedly unlawful employment practices that effected all

20  putative class members, who worked for Cushman performing the same or similar work as

21  Appraisers and Junior Appraisers during the same time period. *See Bellinghausen v. Tractor*

22  *Supply Co.*, 303 F.R.D. 611, 617 (N.D. Cal. 2013) (finding commonality requirement satisfied

23  where class members were subject to the same challenged policies and procedures).

24         Finally, Dixon, the proposed class representative, and class counsel appear to be adequate

25  representatives of the class. Dixon was employed by Defendants during the class period and

26  allegedly injured by the same course of conduct common to all putative class members (Dkt. No.

27  118); thus, Plaintiff's interest in this litigation is aligned with that of the class. *See Amchem*

28  *Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997) ("Representatives must be part of the class

United States District Court
Northern District of California

and possess the same interest and suffer the same injury as the class they seek to represent."). Plaintiff's counsel, Goldstein, Borgen, Dardarian & Ho, Outten & Golden LLP, and the Shavitz Law Group have extensive experience litigating class action wage and hour actions.  (Dkt. No. 115 at ¶¶ 48-59; Dkt. No. 116 at ¶¶ 26-30; Dkt. No. 117 at ¶ 113.)  Thus, it appears that Plaintiff's counsel is "qualified, experienced, and generally able to conduct the class action litigation." *See Bellinghausen*, 303 F.R.D. at 617.

**B. Rule 23(b)(3)**

As previously discussed, Rule 23(b)(3) requires establishing the predominance of common questions of law or fact and the superiority of a class action relative to other available methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3) includes the following nonexhaustive list of factors pertinent to the predominance and superiority analysis:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). There are no predominance or superiority concerns because the challenged policies are common to all class members.

**1. Predominance**

Rule 23(b)(3) first requires "predominance of common questions over individual ones" such that "the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir. 1996). This "inquiry focuses on the relationship between the common and individual issues." *Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 944 (9th Cir. 2009) (internal quotation marks and citation omitted). In particular, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594. When common questions "present a significant aspect of the case [that] can be resolved for all members of the class with a single adjudication," there is justification for "handling the dispute on representative rather than on an individual basis." *Delagarza v. Tesoro Ref. & Mktg. Co.*, No. C-09-5803 EMC, 2011 WL

United States District Court
Northern District of California

1    4017967, at *10 (N.D. Cal. Sept. 8, 2011) (internal quotation marks and citation omitted).

2         The Court is satisfied that the core common questions in this case—whether Cushman

3    properly classified California Class Members as exempt from overtime; whether Cushman was

4    required to provide meal and rest breaks to California Class Members; whether Cushman required

5    California Class Members to have personal cell phones for work and did not reimburse California

6    Class Members for cell phone costs; whether the wage statements provided to California Class

7    Members were accurate; and whether Cushman failed to pay unpaid wages due upon California

8    Class Members' separation from the company —predominate over any differences regarding its

9    implementation of those policies with respect to individual employees. Accordingly, the Court

10   concludes that common questions of law and fact predominate.

11        **2. Superiority**

12        A class action is a superior means of adjudicating a dispute "[w]here classwide litigation of

13   common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at

14   1234. In evaluating superiority, "courts consider the interests of the individual members in

15   controlling their own litigation, the desirability of concentrating the litigation in the particular

16   forum, and the manageability of the class action." *Hunt v. Check Recovery Sys., Inc*., 241 F.R.D.

17   505, 514 (N.D. Cal. 2007), *modified*, 2007 WL 2220972 (N.D. Cal. Aug. 1, 2007), *aff'd sub nom.,*

18   *Hunt v. Imperial Merch. Servs., Inc*., 560 F.3d 1137 (9th Cir. 2009). A class action is superior to

19   individual litigation in this matter for several reasons.

20        First, there is no indication that members of the proposed class have a strong interest in

21   individual litigation or an incentive to pursue their claims individually. *See Chavez v. Blue Sky*

22   *Nat. Beverage Co*., 268 F.R.D. 365, 379 (N.D. Cal. 2010). Second, any concerns over

23   manageability of the class action in this case would not weigh in favor of individual litigation

24   given that Defendants' liability to "class members depends on common proof" regarding the

25   allegedly unlawful employment practices at issue. *See Bowerman v. Field Asset Servs., Inc*., 242

26   F. Supp. 3d 910, 936 (N.D. Cal. 2017) (recognizing as legitimate the defendant's "apprehension

27   regarding manageability," but finding it "insufficient to tip the scales away from the superiority of

28   proceeding as a class when [the defendant's] liability to over 100 class members depends on

common proof"). Finally, class actions are preferred in wage-and-hour actions when individual employees may forgo pursuing their claims due to fear of retaliation. *See Williams v. Superior Ct.*, 3 Cal. 5th 531, 558 (2017) (noting that fear of retaliation cuts in favor of "facilitating collective action so that individual employees need not run the risk of individual suits").

***

Accordingly, the Court concludes that conditional certification of the class for settlement purposes is proper.

## II. Conditional Certification of FLSA Collective Action

Under the FLSA, an employee may bring a "collective action" on behalf of other "similarly situated" employees. 29 U.S.C. § 216(b). Thus, a district court's approval of preliminary certification of an FLSA collective action is "conditioned on a preliminary determination that the collective as defined in the complaint satisfies the 'similarly situated' requirement of section 216(b)." *Campbell*, 903 F.3d at 1109 (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). A party plaintiff and putative collective members are "similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id*. at 1117.

"The limited statutory requirements of a collective action are independent of, and unrelated to, the requirements for class action under Rule 23, and, by omitting most of the requirements in Rule 23 for class certification, necessarily impose a lesser burden." *Id*. at 1112 (internal quotation marks and citations omitted). The court's "level of consideration is lenient" and focuses on whether the pleadings establish a "reasonable basis" for determining that the putative members are similarly situated. *Id*. "A grant of preliminary certification results in the dissemination of a court-approved notice to the putative collective action members, advising them that they must affirmatively opt in to participate in the litigation." *Id*.

Here, conditional certification for settlement purposes is appropriate because two nationwide collectives have already been conditionally certified (the *Seltz* collective covering Junior Appraisers and the *Dixon I* and *II* collectives covering Appraisers and Senior Appraisers in California (*Dixon I*) and outside of California (*Dixon II*)) and notice has been sent to all those

United States District Court
Northern District of California

1  eligible to join the collectives.  (Dkt. No. 115 at ¶ 23.) The collective for settlement purposes, as

2  reflected in the Second Amended Complaint, adds to *Dixon I* Junior Appraisers nationwide and

3  Appraisers who worked for Cushman outside of California so that the collective definition in

4  Dixon I includes all members of the previously certified collectives.  (*Id*.)  In addition, the

5  members of the proposed settlement collective are similarly situated because they were employed

6  in similar positions as real estate appraisers and were subject to the same treatment of Defendants

7  as exempt from the FLSA's overtime requirements. (*Id*.)

8       Accordingly, the Court grants conditional certification of the FLSA collective action.

9  **III. Preliminary Approval of the Settlement Agreement**

10       In determining whether a class action settlement agreement[3] is fair, adequate, and

11  reasonable to all concerned, courts generally consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

16  *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill*

17  *Vill., LLC v. Gen. Elec*., 361 F.3d 566, 575 (9th Cir. 2004)). However, when "a settlement

18  agreement is negotiated prior to formal class certification, consideration of these eight ... factors

19  alone is" insufficient. *Id*.  In such cases, courts must not only consider the above factors, but also

20  ensure that the settlement did not result from collusion among the parties. *Id*. at 947. Because

21  collusion "may not always be evident on the face of a settlement, ... [courts] must be particularly

22  vigilant not only for explicit collusion, but also for more subtle signs that class counsel have

23  allowed pursuit of their own self-interests and that of certain class members to infect the

---

[3] Courts must examine a class action settlement "as a whole, rather than the individual component parts, ... for overall fairness." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998) (noting that "[t]he settlement must stand or fall in its entirety"). That said, the Court must also determine whether the Settlement Agreement "is a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *See Camilo*, 2019 WL 2141970, at *10 (citing *Lynn's Food Stores, Inc*., 679 F.2d 1350, 1353 (11th Cir. 1982)). Here, there is no indication that preliminary approval of the FLSA settlement is unfair given the similarity between the FLSA claims and class claims and the Court's consideration of the fairness factors relevant to class action.

14

negotiations." *Id.* The *Bluetooth* court identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (internal quotation marks and citations omitted).

The Court cannot, however, fully assess such factors until the final approval hearing; thus, "a full fairness analysis is unnecessary at this stage." *See Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (internal quotation marks and citation omitted). At the preliminary approval stage, "the settlement need only be potentially fair." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. May 31, 2007). Preliminary approval is thus appropriate where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal quotation marks and citation omitted).

### A. The Fairness Factors

#### 1. Settlement Process

The first factor concerns "the means by which the parties arrived at settlement." *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011). To approve a proposed settlement, a court must be satisfied that the parties "have engaged in sufficient investigation of the facts to enable the court to intelligently make ... an appraisal of the settlement." *Acosta*, 243 F.R.D. at 396. Courts thus have "an obligation to evaluate the scope and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an agreement." *Id.*

Plaintiff Dixon submits declarations from her counsel Laura Ho and Deirdre Aaron in

United States District Court
Northern District of California

1   support of her motion for preliminary approval.  (Dkt. Nos. 115, 116.)  Prior to filing suit, counsel

2   in *Dixon I* conducted an intensive investigation into the facts underlying the alleged violations.

3   (Dkt. No. 115 at ¶ 3.)  Counsel in the *Seltz* case, attempted to resolve the matter prior to filing suit,

4   but were unable to do so.  (Dkt. No. 116 at ¶¶ 4-6.)

5        Early in the litigation, counsel for Plaintiffs Seltz and Dixon agreed to coordinate

6   discovery and scheduling.  (Dkt. No. 115 at ¶ 7.)  The parties attended a joint mediation in June

7   2018, but were unable to resolve the matter.  (Dkt. No. 115 at ¶ 5; Dkt. No. 116 at ¶ 7.)  In

8   November 2018, the *Seltz* and *Dixon I* parties agreed to stay the two cases to engage in

9   comprehensive settlement negotiations.  (Dkt. No. 115 at ¶ 7.)  Cushman agreed to engage in

10  limited and targeted discovery to aid mediation, and provided pay data for putative class members,

11  job descriptions, and pay policy documents. (*Id*.)  In June 2019, Plaintiff Seltz's counsel, Plaintiff

12  Dixon's counsel, and Cushman's counsel attended mediation with David Rottman in San

13  Francisco, CA, but were unable to reach a resolution. (*Id*.)

14       Plaintiffs thereafter moved for and were granted conditional certification in the *Dixon I*,

15  *Dixon II*, and *Seltz* actions.  (*Id*. at ¶ 8.)  The parties thereafter agreed to stay proceedings so that

16  they could attend a third mediation with David Rottman.  (*Id*.)  In preparation for mediation,

17  Cushman produced updated payroll data. (*Id*.)  On March 11, 2021, the parties attended an all-day

18  meditation and reached an agreement in principle to settle the cases a week later.  (*Id*. at ¶ 9.)  The

19  settlement agreement was fully executed three months later.  As part of the settlement, the parties

20  agreed to add Plaintiff Seltz to *Dixon I*, add Cushman and Wakefield of Washington, DC, Inc. as

21  Defendants, amend the class definition to include Junior Appraisers in California, and amend the

22  collective definition to include Junior Appraisers and Appraisers who worked outside of

23  California.  (*Id*. at ¶ 10.)

24       The use of an experienced private mediator and presence of discovery supports the

25  conclusion that Plaintiffs were "armed with sufficient information about the case" to broker a fair

26  settlement. *See Acosta*, 243 F.R.D. at 396; *see also Villegas*, 2012 WL 5878390, at *6 (finding

27  two sessions of private mediation before an experienced mediator, which were "informed by ...

28  discovery," sufficient to "support the conclusion that the [p]laintiff was appropriately informed in

negotiating a settlement").  Here, the fact that the parties engaged in extensive discovery, participated in three mediations with experienced mediators, and obtained conditional certification of the FLSA classes pre-settlement all indicate that Plaintiffs were well-informed about the cases and their strengths and weaknesses prior to entering into the Settlement Agreement.

As such, the Settlement Agreement appears to be the product of serious, informed, non-collusive negotiations. This factor thus weighs in favor of preliminary approval.

### 2. Obvious Deficiencies

The Court must next consider "whether there are obvious deficiencies in the Settlement Agreement." *See Harris*, 2011 WL 1627973, at *8.  After reviewing Plaintiffs' initial preliminary approval motion, the Court has several concerns regarding the adequacy of the agreement.  (Dkt. No. 126.)  Having reviewed Plaintiffs' supplemental briefing and as discussed more fully below in the context of the adequacy of the settlement amount, the Court is reassured that the Settlement Agreement does not contain an obvious deficiencies.

### 3. Lack of Preferential Treatment

The Court must next examine whether the Settlement Agreement "provides preferential treatment to any class member." *See Villegas*, 2012 WL 5878390, at *7. Under the Agreement, individual settlement payments will be calculated using a point-based formula with California class members who opted into the FLSA action receiving the most points and individuals who only opted into the FLSA action after the settlement receiving the least amount of points. (Dkt. No. 115 at ¶ 13; Dkt. No. 115-1 at § 2.8(f).) The Agreement further provides that Plaintiffs Dixon and Seltz will also receive a $10,000 service award, and individuals who submitted a declaration (Declarants Benjamin Blake, Eric Hix, Katherine Pierno, John Dickerson, Heather Elliot, and Teresa Simone) will shall receive an award of $2,000 each. (*Id*. at ¶ 2.8(e).)

"Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one"). Service awards "are intended to compensate class representatives for work done on behalf of the class, to make up

United States District Court
Northern District of California

for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Id*. at 958-59. Although service awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id*. at 960 (internal quotation marks and citation omitted).

Plaintiffs assert that the service awards are fair and reasonable to compensate them for the critical role they played in stepping forward to bring the case and the time and effort they expended to obtain the results here. (Dkt. No. 115 at ¶ 40.) According to Counsel, "Plaintiffs played a critical role in securing this settlement for class members, many of whom were scared to opt into the FLSA actions due to fears of negative employment repercussions." (*Id*.) Plaintiffs also seek a $2,000 service award for each class member who provided a declaration in support of conditional certification of the FLSA claims. Counsel estimates that each declarant spent about five hours with counsel investigating and drafting the declarations. (*Id*. at ¶ 42.)

The Court has concerns regarding the service awards requested here. First, the $10,000 service award for Plaintiffs Dixon and Seltz are higher than amounts typically awarded by courts in this Circuit. *See, e.g., In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 463 (9th Cir. 2000) (approving $5,000 to two plaintiff representatives of 5,400 potential class members in $1.75 million settlement); *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *37 (N.D. Cal. Apr. 1, 2011) (approving $5,000 incentive awards to each of 24 named plaintiffs in $27,000,000 settlement); *Hopson v. Hanesbrands, Inc*., No. CV-08-0844 EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) (approving $5,000 award to one member of 217-member class in $408,420 settlement). Second, Plaintiffs do not provide any legal authority for providing service awards to individuals who submitted declarations, but were not named plaintiffs. The citation to *Wellens v. Sankyo*, No. C 13-00581 WHO (DMR), 2016 WL 8115715, at *4 (N.D. Cal. Feb. 11, 2016), is unavailing as it does not analyze the propriety of a service award to individuals who only submit declarations. In considering whether the settlement is fair, the Court looks at, among other

United States District Court
Northern District of California

1    factors, whether it improperly grants preferential treatment to class representatives or segments of the

2    class.  *See In re Tableware Antitrust Litig.*, 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007).

3        The Court will defer ruling on the appropriateness of the amount of the requested service

4    awards until final approval. At this stage, notwithstanding the Court's concerns, there is no indication

5    that the service award in general constitutes "preferential treatment" such that it would defeat

6    preliminary approval.

7        **4. Range of Possible Approval**

8        In determining whether the Settlement Agreement "falls within the range of possible

9    approval," the Court must focus on "substantive fairness and adequacy" and consider Plaintiffs

10   "expected recovery balanced against the value of the settlement offer." *See Tableware*, 484 F. Supp.

11   2d at 1080; *see also Harris*, 2011 WL 1627973, at *11 (noting that courts "must estimate the

12   maximum amount of damages recoverable in a successful litigation and compare that with the

13   settlement amount" in determining "the value of the settlement against the expected recovery at trial")

14   (internal quotation marks and citation omitted). "[I]t is well-settled law that a proposed settlement may

15   be acceptable even though it amounts only to a fraction of the potential recovery that might be

16   available to class members at trial." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523,

17   527 (C.D. Cal. 2004).

18       Upon initial review of Plaintiffs' motion for preliminary approval, the Court had a number of

19   concerns regarding the settlement amount and thus requested supplemental briefing.  (Dkt. No. 126.)

20   Upon review of the supplemental briefing, the Court is reassured as to the substantive fairness and

21   adequacy of the settlement.

22       First, the Settlement Agreement provides for a "maximum" Total Settlement Fund of $4.9

23   million, which Plaintiffs have explained is because Defendants are not required to fund any

24   amounts allocated to Non-California Opt-in Eligible Plaintiffs unless and until those individuals

25   affirmatively choose to opt into the FLSA claim and agree to be bound by the terms of the

26   Settlement Agreement.  (Dkt. No. 128 at 10; Dkt. No. 115-1, Settlement Agreement §§ 1.41(a);

27   2.8(a).)   Although the Court was concerned that this raised potential red flags as a reversion,

28   having reviewed Plaintiffs' response the Court is persuaded, at least at the preliminary approval

stage, that treating the class and collective claims differently is appropriate here.

Under the Settlement Agreement, Defendants must fully fund the settlement amount except for the amount "allocated to any Non-California Opt-in Eligible Plaintiff who does not submit a claim form[;]" that is, Defendants must fully fund the class claims, but is only required to fund the collective claims for those who opt to participate.  (Dkt. No. 129 at ¶ 4.)  Courts routinely approve settlements which likewise treat class and collective claims differently because the due process concerns that attach to a class settlement do not attach to a collective settlement as members of the collective are not bound by the settlement unless they opt-in.  *See e.g.*, *Foster v. Advantage Sales & Mktg., LLC*., No. 18-CV-07205-LB, 2019 WL 6699793, at *3 (N.D. Cal. Dec. 9, 2019) (preliminarily approving settlement where if non-California members of the collective did not cash the check, they would not be deemed to have opted in and the funds would revert to the defendant); *Nur v. Tatitlek Support Servs., Inc*., No. 15CV00094SVWJPRX, 2016 WL 3039573, at *3 (C.D. Cal. Apr. 25, 2016) ("claims-made settlements, with a reversion of unclaimed funds to the employer are routinely approved by the Ninth Circuit and Courts in California" and collecting cases); *see also Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101 (9th Cir. 2018) ("unlike in the Rule 23 context, the district court in a collective action plays no such gatekeeping role. Preliminary certification in the FLSA context does not produce a class with an independent legal status[ ] or join additional parties to the action.") (internal citations and quotation marks omitted; alterations in the original); *id.* at 1112 ("many of the rules specific to class actions have evolved to protect the due process rights of absent class members, a consideration not pertinent under the post-1947 FLSA.").

Further, Plaintiffs estimate that the amount of any reversion here will be small compared to the size of the settlement. The FLSA opt-in portion of the claims make up approximately $1.3 million of the $4.9 million settlement, but Plaintiffs estimate that at least 30 percent of individuals will submit claim forms which would equal about $403,147.39, leaving the amount of potential reversion as $940,677.24.  (Dkt. No. 129 at ¶ 6.) The Court is thus sufficiently persuaded—at least for purposes of preliminary approval—that a claims-made distribution with only those who opt-in releasing any claims and the funds for those who do not opt-in to reverting to Defendants is fair and reasonable under the circumstances here.

Second, Plaintiffs have adequately explained how the Settlement Amount will be allocated using a point-based formula. Each Non-California Opt-in Eligible Plaintiff (i.e. individuals who are eligible to opt into the FLSA claims and were mailed a notice of the collective actions prior to the settlement but chose not to opt-in) will receive one point per workweek; each *Seltz* Opt-in Plaintiff (i.e. individuals who opted into the *Seltz* FLSA claim) and *Dixon II* Opt-in Plaintiff (i.e. individuals who opted into the *Dixon II* FLSA claim) will receive two points per workweek; each California Class Member (i.e. individuals who worked for Defendants in California but did not opt into the *Dixon I* FLSA action) will receive three points per workweek; and each *Dixon I* Opt-in Plaintiff (i.e. individuals who both worked in California and opted into the *Dixon I* FLSA action) will receive four points per workweek.  (Dkt. No. 115, Ho Decl. at ¶ 13.)  Plaintiff highlights several cases where preliminary and final approval has been granted of settlements using similar point based systems.  *See Rabin v. PricewaterhouseCoopers LLP*, No. 16-CV-02276-JST, 2021 WL 837626, at *3 (N.D. Cal. Feb. 4, 2021); *Walton et al v. AT&T Services, Inc*., No. 15-3653 VC, Dkt. No. 204 (N.D. Cal. Oct. 16, 2017).

Further, in Plaintiffs' supplemental briefing, Plaintiffs have explained both how many class members fit in each point category and the potential recovery in each point category.

- One Point Settlement Collective Members (i.e. Non-California Opt-in Eligible Plaintiffs): Approximately 347 individuals totaling $1,343,825 (about $28 per workweek).

- Two Point Settlement Collective Members (i.e. *Seltz/Dixon II* Opt-in Plaintiffs): Approximately 20 individuals totaling $98,150 (about $57 per workweek).

- Three Point California Settlement Class Members (i.e. *Dixon I* Class Members who did not opt-in to the FLSA claim): Approximately 101 individuals totaling $1,524,983 (about $85 per workweek).

- Four Point California Settlement Class Members (i.e. *Dixon I* Class Members who also opted into the FLSA claim): Approximately 10 individuals totaling $167,709 (about $113 per workweek).

(Dkt. No. 128 at 16-18.)  Plaintiffs have also explained how they calculated these amounts:

21

United States District Court
Northern District of California

> Plaintiffs assumed that Class/Collective Members worked an average of 10 hours per week in overtime for both FLSA and California overtime claims. Plaintiffs also accounted for the fact that Junior Appraisers were reclassified as non-exempt on September 9, 2019, and that Defendants changed its pay practices for Appraisers and Senior Appraisers who received only recoverable draws in January 2021. [In addition, for] California Class Members, Plaintiffs assumed an average of five missed meal and rest periods per week, and an average of $12.50 in unreimbursed expenses (for costs associated with Appraisers' use of their personal cell phones for business purposes) per week. For the California wage statement violation, which has a shorter statute of limitations period, Plaintiffs assumed that every Class Member who had an overtime or meal/rest period violation also had a wage statement violation in the same pay period. For the California waiting time penalties, Plaintiffs assumed that each Class Member who stopped working for Defendants in the applicable limitations period had a violation and accrued 30 days of wages as a penalty. Plaintiffs made the same assumptions for purposes of calculating PAGA penalties.

(Dkt. No. 129 at ¶¶ 14-15; *see also* Dkt. No. 129-5 (detailing damages calculations).)  Plaintiffs also explained how they calculated the settlement value of each claim in light of the litigation risks deducting 60 percent from each point category based on the inherent difficulties of proving hours worked as well as other ranging discounts for each of Defendants' defenses and whether the class member had elected to opt-in prior to settlement.  (Dkt. No. 129 at ¶ 17.)

Third, Plaintiffs estimate that the maximum total exposure in these three cases is around $61 million before consideration of litigation risks, which when compared to the maximum Total Settlement Fund of $4.9 million represents an 8% recovery.  (Dkt. No. 115 at ¶ 37.)  Plaintiffs' counsel attests that any likely recovery in this action would be well below $61 million given the difficulty in proving overtime hours which represent the bulk of Defendants' damages exposure and the challenges of establishing class-wide liability.  (*Id.* at ¶¶ 35-37.)   Given these risks, the Court concludes that the settlement amount is reasonable and in keeping with the range of reasonableness. *See Stovall-Gusman v. W.W. Granger, Inc.*, No. 13-CV-02540-HSG, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (collecting cases).

Finally, when considering the range of approval, the Court also considers the non-monetary relief Plaintiffs have already obtained; namely, that Defendants reclassified Junior Appraisers as non-exempt as of September 9, 2019 and changed its pay practices for employees who received recoverable draws as of January 2021, instead paying a fixed, non-recoverable annual salary and separately paying

22

1    a production bonus if the amount exceeds the Appraiser's annual salary.  (Dkt. No. 115 at ¶ 2.)

2    Further, under the Settlement Agreement Defendants agreed not to enforce any of its promissory notes

3    against any participating settlement member. (*Id.*; Dkt. No. 115-1 at § 4.2.)  These are significant

4    forms of relief to current and future Appraisers that came about because of Plaintiffs' lawsuits.

5         Thus, in sum, the risks and costs of continued litigation at least balance the benefit of the

6    estimated payout to class members when the non-monetary relief is considered, warranting preliminary

7    approval and comment from class members.

8                                                    ***

9         Accordingly, consideration of the fairness factors warrants preliminary approval of the

10   Settlement Agreement.

11   **B. Class Notice Plan**

12        For any class certified under Rule 23(b)(3), class members must be afforded "the best

13   notice that is practicable under the circumstances, including individual notice to all members who

14   can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Such notice must clearly

15   state the following:

16            (i) the nature of the action; (ii) the definition of the class certified; (iii)
              the class claims, issues, or defenses; (iv) that a class member may
17            enter an appearance through an attorney if the member so desires; (v)
              that the court will exclude from the class any member who requests
18            exclusion; (vi) the time and manner for requesting exclusion; and (vii)
              the binding effect of a class judgment on members under Rule
19            23(c)(3).

20   Fed. R. Civ. P. 23(c)(2)(B). "Notice is satisfactory if it generally describes the terms of the

21   settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

22   forward and be heard." *Churchill*, 361 F.3d at 575 (internal quotation marks and citation omitted).

23        In response to the Court's concerns, Plaintiffs submitted Revised Notices.  (Dkt. Nos 129-2

24   to 129-4.)  These Revised Notices comply with the notice requirements under Rule 23(c).[4]  The

25   Revised Notices describe the allegations and claims in plain language, defines a class member and

26

27   ─────────────────────
     [4] In addition to the requirements under Rule 23(c), the Revised Notices comply with the Northern
28   District's Procedural Guidance for Class Action Settlements, available at
     https://www.cand.uscourts.gov/ClassActionSettlementGuidance.

                                                    23

United States District Court
Northern District of California

United States District Court
Northern District of California

FLSA Collective member, includes contact information for Class Counsel and the Claims Administrator, and summarizes the settlement amount and its distribution. The Revised Notices clearly provide an estimate for each individual's potential *minimum* amount of recovery on the first page.  The Revised Notices further describe the options available to class members, including instructions for opting out of the settlement and filing an objection. The Revised Notices also inform class members that receiving a share of the class settlement will release certain claims against certain parties, and that opting-in to the FLSA Collective will release the FLSA claim. The Notice informs class members that they may appear at the final fairness hearing in person or through an attorney. It directs class members to a website with more information, including the Settlement Agreement and pleadings. Finally, the Revised Notices adequately advise how the class can review Class Counsel's motion for attorneys' fees and costs prior to the final approval hearing. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 995 (9th Cir. 2010) (holding that class members must "have an opportunity to oppose class counsel's fee motion").  In addition, the notice plan, as summarized above is adequate in light of Class Counsel's clarification that notice will be sent via mail and email.  (Dkt. No. 129 at ¶ 11.)

In sum, these procedures appear sufficient to ensure that class members receive adequate notice of the settlement and an opportunity to opt-out or object.  Accordingly, the Revised Notices and notice plan support preliminary approval.

### C. Attorneys' Fees

Rule 23(h) provides for an award of attorneys' fees and costs in a certified class action where it is "authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Staton*, 327 F.3d at 963 ("[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement."). Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method to determine whether the requested fees are reasonable. *In re Mercury*, 618 F.3d at 992. The Ninth Circuit has established a benchmark of 25

percent of the common fund for attorneys' fees calculations under the latter method. *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) ("We have ... established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach."). Although "[a] district court may depart from the benchmark ..., it must be made clear by the district court how it arrives at the figure ultimately awarded." *Id*. at 1256-57.

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Bluetooth*, 654 F.3d at 941. The resulting figure may be adjusted upward or downward to account for several factors, "including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id*. at 941-42 (internal quotation marks and citation omitted). The party requesting fees bears the burden "of submitting billing records to establish that the number of hours it requested are reasonable," *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013), as well as "produc[ing] satisfactory evidence—in addition to the attorneys' own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (internal quotation marks and citation omitted). The Ninth Circuit recommends that whether the lodestar or percentage-of-recovery method is used, the district court perform a cross-check using the other method to confirm the reasonableness of the fee (e.g., if the percentage-of-recovery method is applied, a cross-check with the lodestar method will reveal if the amount requested is unreasonable in light of the hours reasonably expended). *See Bluetooth*, 654 F.3d at 944-45.

As previously discussed, the Settlement Agreement provides for a maximum award of $1,633,333.33 to Class Counsel in fees (one-third of the Gross Settlement Amount). (Dkt. No. 115-1 at § 2.8(d).)  Defendants do not oppose this request.  Plaintiffs' supplemental brief clarifies that if the Court does not award the full amount, then the difference shall be included in the Net Settlement Amount to be distributed to the class.  (Dkt. No. 129 at ¶ 13.)  Plaintiffs contend that this amount will be below their lodestar which as of May 2021 was $1,627,990 and is estimated to

1    total $2,128,050 once all the settlement funds are disbursed.  (Dkt. No. 115 at ¶ 46.)  Class counsel

2    attests that they will provide an updated, detailed breakdown of their lodestar with their motion for

3    attorneys' fees.  (*Id*.)

4         Accordingly, Plaintiffs shall submit a motion for attorneys' fees including declarations and

5    detailed billing records so that the Court may determine an appropriate lodestar figure, and to

6    allow class members the opportunity to object to the requested fees. *See In re Mercury*, 618 F.3d

7    at 995 (holding that class members must "have an opportunity to oppose class counsel's fee

8    motion" before the deadline for filing objections set forth in the class notice).

9    **D. Costs**

10        "There is no doubt that an attorney who has created a common fund for the benefit of the

11   class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v.*

12   *Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted). To

13   that end, district courts in this circuit regularly award litigation costs and expenses in wage-and-

14   hour class actions. *See, e.g.*, *id.*; *Nwabueze v. AT&T Inc.*, No. C 09-01529 SI, 2014 WL 324262, at

15   *2 (N.D. Cal. Jan. 29, 2014); *LaGarde v. Support.com, Inc.*, No. C 12-0609, 2013 WL 1283325, at

16   *13 (N.D. Cal. Mar. 26, 2013). Here, the Settlement Agreement provides that Plaintiffs' counsel

17   may obtain up to $60,000 in litigation costs as well as a separate allocation of $20,000 in

18   settlement administration costs.  (Dkt. No. 115-1 at §§ 2.8(c)-(d).)  Plaintiffs' counsel is instructed

19   to submit an itemized summary of each category of costs with its motion for attorneys' fees so that

20   the Court can determine whether such costs are reasonable expenses incurred for the benefit of the

21   class.

22                                          **CONCLUSION**

23        For the reasons stated above, the Court GRANTS preliminary approval of the class and

24   collective action settlement as follows:

25        1. Laura L. Ho and Ginger Grimes of the law firm of Goldstein, Borgen, Dardarian & Ho;

26   Justin M. Swartz, Deirdre Aaron, Jahan C. Sagafi, and Molly J. Frandsen of the law firm Outten &

27   Golden LLP; and Paolo Meireles of the law firm Shavitz Law Group, P.A. are appointed as Class

28   Counsel.

United States District Court
Northern District of California

2. The Notices shall be mailed and emailed to class members in accordance with the notice plan by September 20, 2021.

3. The deadline for class members to submit a Request for Exclusion shall be 60-days after the initial mailing of the Notice, and no later than November 22, 2021.

4. The deadline for class members to object to the Settlement Agreement shall be 60-days after the initial mailing of the Notice, and no later than November 22, 2021.

5.  The deadline for Non-California Opt-In Eligible Plaintiffs to submit claim form shall be 60-days from the date of initial mailing, or 90-days from the date of initial mailing for remails.

6. Class Counsel shall file a motion for attorneys' fees and costs by October 25, 2021.

6. Plaintiffs shall file their Motion for Final Approval by February 24, 2022. The motion shall include a copy of the Notices ultimately sent to the class along with the other information, as available, suggested by the Northern District of California Procedural Guidance for Class Action Settlements.

9. The parties shall appear before this Court for a final approval hearing on March 31, 2022 at 9:00 a.m.

**IT IS SO ORDERED.**

Dated: August 30, 2021

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California