1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIMITRI DIXON, et al.,

Plaintiffs,

v.

CUSHMAN & WAKEFIELD WESTERN, INC., et al.,

Defendants.

Case No.  18-cv-05813-JSC

**ORDER RE: MOTION FOR FINAL APPROVAL; MOTION FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS**

Re: Dkt. Nos. 135, 141

In this wage and hour lawsuit, Plaintiffs allege that Cushman & Wakefield Western, Inc. unlawfully denied appraiser and senior appraiser employees guaranteed wage and overtime compensation due to their misclassification as exempt employees under California wage and hour laws, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.  The parties in *Dixon* have reached a global settlement which resolves three cases that are being combined into one amended complaint in the instant case for settlement purposes: (1) *Dixon v. Cushman & Wakefield Western, Inc.*, Case No. 3:18-cv-05813-JSC (N.D. Cal.) ("*Dixon I*"); (2) *Dixon v. Cushman & Wakefield, Inc.*, Case No. 3:20-cv-07001-JSC (N.D. Cal.) ("*Dixon II*"); and (3) *Seltz v. Cushman & Wakefield, Inc.*, Case No. 1:18-cv-02092-BAH (D. D.C.) ("*Seltz*"). Plaintiffs' unopposed motion for final approval of the class and collective settlement, and motion for attorneys' fees and costs, and incentive awards are now pending before the Court. (Dkt. Nos. 135, 141.)  Following receipt of the motions, the Court requested supplemental briefing.  (Dkt. No. 153.)   Having considered the motions, including Plaintiffs' supplemental submission, and having had the benefit of oral argument, the Court GRANTS the motion for final approval, and GRANTS IN PART and DENIES IN PART the motion for attorneys' fees and costs, and incentive awards.

        //

**BACKGROUND**

The factual and procedural background of these actions is discussed in detail in the Court's preliminary approval order and is incorporated by reference here.  (Dkt. No. 134 at 2-3.)

**THE SETTLEMENT AGREEMENT**

**A. The Class**

Following settlement, Plaintiffs filed a Second Amended Complaint which added Plaintiff Ryan Seltz to *Dixon I*, added Cushman and Wakefield, Inc. and Cushman and Wakefield of Washington, DC, Inc. as Defendants, and amended the class definition to include Junior Appraisers in California and the collective definition to include Junior Appraisers and Appraisers who worked outside of California.  (Dkt. No. 115 at ¶ 10; Dkt. No. 113, Second Amended Complaint ("SAC").)

**1. FLSA Collective**

Pursuant to 29 U.S.C. § 216, Plaintiffs seek to prosecute the FLSA claims as a collective action on behalf of two groups of Appraisers.  (*Id*. at ¶¶ 41-42.)   Conditional certification of these collectives was granted in November 2020.  (Dkt. No. 115 at ¶ 8.)

Plaintiff Dixon represents the following collective of Appraisers:

> All persons employed by CUSHMAN AND WAKEFIELD WESTERN, INC. and CUSHMAN AND WAKEFIELD, INC., as Appraisers (including and Senior Appraisers) assigned to at least one Cushman & Wakefield office in any state between October 7, 2017 through May 31, 2021 ("*Dixon* Collective").

(Dkt. No. 113, SAC at ¶ 41.)

Plaintiff Seltz represents the following collective of Junior Appraisers:

> All persons employed by CUSHMAN AND WAKEFIELD, INC., and CUSHMAN AND WAKEFIELD, OF WASHINGTON, DC, INC. as Junior Appraisers or Associate Appraisers assigned to at least one Cushman &Wakefield office in any state between October 12, 2016 through September 9, 2019 ("*Seltz* Collective").

(*Id.* at ¶ 42.)

**2. California Class**

On preliminary approval, the Court granted conditional certification for Plaintiff Dixon to represent a Rule 23 class of the following:

> All persons employed in California by CUSHMAN AND WAKEFIELD WESTERN, INC., and CUSHMAN AND WAKEFIELD, INC., as an Appraiser (including Junior Appraisers and Senior Appraisers) assigned to at least one Cushman & Wakefield office between August 14, 2014 through May 31, 2021 ("California Class Action Members").

(*Id.* at ¶ 49; Dkt. No. 134 at 13.)

**B. Payment Terms**

The settlement called for a common fund of up to $4,900,000.  Based on the claims filed, the actual common fund amount is $3,876,130.59.  (Dkt. No. 154 at ¶ 7.)

1. Of this amount, $2,110,797.25 will go to individual settlement awards (the "Net Settlement Fund,") under the following formula (Dkt. No. 115-1, Settlement Agreement at § 2.8(f)):

> a.  One point for each Non-California Opt-in Eligible Plaintiff (i.e. individuals who are eligible to opt into the FLSA claims and received a notice of the collective actions prior to the settlement but chose not to opt-in) workweek;
>
> b.  Two points for each *Seltz* Opt-in Plaintiff (i.e. individuals who opted into the *Seltz* FLSA claim) and *Dixon II* Opt-in Plaintiff (i.e. individuals who opted into the *Dixon II* FLSA claim) workweek;
>
> c.  Three points for each California Class Member (i.e. individuals who worked for Defendants in California but did not opt into the *Dixon I* FLSA action) workweek; and,
>
> d.  Four points for each *Dixon I* Opt-in Plaintiff (i.e. individuals who both worked in California and opted into the *Dixon I* FLSA action) workweek.

2. Each California Class Member's individual payment will be allocated one-third to wages, two-thirds to non-wages (*Id.* § 2.8(g)), and all other Participating Claimants' individual payments will be allocated half to wages and half to nonwages (*Id.* § 2.8(g)).

3. Defendant will separately pay an estimated additional $107,203.12 for payroll taxes.  (Dkt. No. 154 at ¶ 8.)

United States District Court
Northern District of California

4. All California Class Members and *Dixon II* and *Seltz* Opt-in Plaintiffs will be mailed a check (with no claim forms required) except those California Class Members who affirmatively opted out. (Dkt. No. 115-1 § 2.5(a));

5. Defendants are not responsible for paying the amount of the Net Settlement Fund equal to the combined Individual Payment Amounts for the Non-California Opt-in Eligible Plaintiffs who did not opt into the settlement. (*Id.* § 2.8(a));

6. Any uncashed checks 180 days after the initial mailing will be voided and distributed as follows:

    a. California Class Members' uncashed checks will be sent to the Controller of the State of California in the name of the California Class Member and held under the Unclaimed Property Law; (*Id.* § 2.8(i)(1));

    b. Uncashed checks by Non-California Opt-in Eligible Plaintiffs who timely submitted consent to join forms will be sent to a *cy pres* beneficiary mutually agreed upon by the Parties and approved by the Court; (*Id.* § 2.8(i)(2));

    c. Uncashed checks by *Dixon II* Opt-in Plaintiffs and *Seltz* Opt-in Plaintiffs will be deposited into Plaintiffs' Counsel's client trust account and held until the Plaintiff can be located (*Id.* § 2.8(i)(3));

7. $20,000 to the California Labor Agency ("LWDA") for the State of California's share of the $26,666.67 allocation of the fund for PAGA penalties (*Id.* § 2.8(h));

    a. 25% of the PAGA allocation ($26,666.67), equal to $6,666.67, will be split pro rata among California Class Members who worked on or after August 14, 2017 (*Id.* § 2.8(h));

8. Service awards to Named Plaintiffs ($10,000 each to Plaintiffs Dixon and Seltz) and Declarants ($2,000 each to Benjamin Blake, Eric Hix, Katherine Pierno, John Dickerson, Heather Elliot, and Teresa Simone) (*Id.* § 2.8(e));

9. Settlement administration costs no greater than $20,000 (*Id.* § 2.8(e));

10. The payment of one-third of the maximum common fund, or $1,633,333.33, as

attorneys' fees (*Id.* § 2.8(d));

11. Reimbursement of actual litigation costs of not more than $60,000 (*Id.* § 2.8(d)).

**C. Scope of Release**

The California Class Members (except any who opt out of the settlement) will release claims that were asserted or could have been brought based on the facts alleged in the Second Amended Complaint related to Defendants' misclassification of California Class Members as exempt from California and federal overtime laws.  (*Id.* at § 4.1.)  No California Class Members may opt out of the release of PAGA claims.  (*Id.*) Opt-ins and Non-California Eligible Opt-ins who submit a claim form will release claims that were asserted or could have been brought based on the facts alleged in the Second Amended Complaint related to Defendants' misclassification of Opt-in Plaintiffs and Non-California Eligible Opt-ins as exempt from federal and state overtime laws.  (*Id.*)  In contrast, Non-California Eligible Opt-ins who do not opt into the FLSA action do not release any claims against Defendants.  (*Id.* § 2.5(f).) Both named Plaintiffs will sign a general release of claims in exchange for their service award.  (*Id.* § 2.8(e).)

**D. Notice**

On September 3, 2021, the settlement administrator, CPT Group, received a list of the names, addresses, social security numbers, and other information for the Settlement Class Members, Opt-in Plaintiffs, and Non-California Opt-In Eligible Plaintiffs. (Dkt. No. 139, Hitomi Decl. at ¶ 3.)  The settlement administrator processed the settlement class member addresses through the National Change of Address database and mailed notices to the last known addresses of the Settlement Class Members, Opt-in Plaintiffs, and Non-California Opt-In Eligible Plaintiffs. (*Id.* ¶ 4.)  The settlement administrator also sent email notices for the 206 Settlement Class Members, Opt-in Plaintiffs, and Non-California Opt-In Eligible Plaintiffs for whom email addresses were available.  (*Id.*)  Of the 475 Notice Packets sent, 18 were returned.  (Dkt. No. 144, Suppl. Hitomi Decl. ¶ 9.)  The settlement administrator remailed 14 of these notices after finding a better mailing address, and for the remaining 4 the notice packets were resent via email.  (*Id.*)  In total, only 4 Class Members did not receive any type of notice because every mailing or e-mailing attempt was returned to the settlement administrator as undeliverable.  (*Id.*)  On October 21, 2021,

1     the settlement administrator sent reminder mailings and emails to the 337 Non-California Opt-In

2     Eligible Plaintiffs who had not yet responded. (Dkt. No. 139 at ¶ 9.)

3         Prior to sending notice, the settlement administrator established a toll-free phone number

4     and an email address that Class Members could contact with questions about the settlement or to

5     request re-mailings of the Notice and Claim Form. (Dkt. No. 144 ¶¶ 4, 6.)  The settlement

6     administrator received 91 phone calls from Class Members and 12 emails from settlement class

7     members. (*Id.*)  The settlement administrator received one workweek dispute from a Class

8     Member. After extensive review, the Class Member's dispute was approved, and her workweeks

9     were updated in the class database and the award calculations were updated accordingly.  (*Id.* ¶

10    12.)

11        **E. Opt-Outs and Objections**

12        All of the California Class Members covered by the Settlement chose to accept it—there

13    were no objections or opt outs.  (Dkt. No. 142 ¶ 7; Dkt. No. 144 ¶¶ 10-11.)  None of the non-

14    California collective members could object or opt-out of the settlement.  (Dkt. No. 115-1, §§

15    2.5(f); 4.1.)

16                              **DISCUSSION**

17        The approval of a settlement is a multi-step process. At the preliminary approval stage, the

18    court should grant such approval only if it is justified by the parties' showing that the court will

19    likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve

20    the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the

21    class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class

22    will be notified, and a final fairness hearing scheduled to determine if the settlement is fair,

23    adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-

24    00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012). At the second stage,

25    "after notice is given to putative class members, the Court entertains any of their objections to (1)

26    the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v.

27    Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*,

28    876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must reach a

United States District Court
Northern District of California

final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## I. Final Certification of the Class and Collective

### A. Rule 23 Certification of the Settlement Class

The Court previously granted conditional certification under Rule 23(b)(3). (Dkt. No. 134.) The Court is unaware of any changes that would alter its analysis, and there was no indication in Plaintiffs' papers or at the fairness hearing that any such developments had occurred. Further, there were no objections by individual class members who claim to have an interest in controlling the prosecution of this action or related actions. Further, the Court is satisfied that the content of the Notices was sufficient under Rule 23(c)(2)(A). (Dkt. No. 144-1 to 144-5.) *See Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (internal quotation marks and citation omitted).

### B. Certification of the FLSA Collective

Under the FLSA, an employee may bring a "collective action" on behalf of other "similarly situated" employees. 29 U.S.C. § 216(b); *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1117 (9th Cir. 2018) (noting that a party plaintiff and putative collective members are "similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims"). The Court's Preliminary Approval Order granted conditional certification of the FLSA collective for settlement purposes because Plaintiffs made a plausible showing that they were similarly situated to the putative collective members. (Dkt. No. 134 at 13-14.) There is nothing to suggest the Court was wrong on that score; thus, the Court grants final certification of the FLSA collective for settlement purposes.

"If the collective action members are similarly situated, most courts then evaluate the settlement under the standard established by the Eleventh Circuit, which requires the settlement to constitute a fair and reasonable resolution of a bona fide dispute." *Otey v. CrowdFlower, Inc*., No.

United States District Court
Northern District of California

1   12-cv-05524, 2014 WL 1477630, at *3 n.5 (N.D. Cal. Apr. 15, 2014) (collecting cases) (internal

2   quotation marks and citation omitted). "[T]he factors that courts consider when evaluating a

3   collective action settlement are essentially the same as those that courts consider when evaluating

4   a [class action] settlement" under Rule 23(e). *See id*. at *11 (applying same fairness factors to

5   settlement involving FLSA collective and class action). Thus, the Court will address the fairness

6   of the settlement as it pertains to both the class and collective actions using the same factors.

7   **II. Approval of the *Cy Pres* Recipient**

8       A *cy pres* award is "a tool for 'distributing unclaimed or non-distributable portions of a

9   class action settlement fund to the next best class of beneficiaries.'" *In re Google Inc. St. View

10  Elec. Commc'ns Litig*., 21 F.4th 1102, 1111 (9th Cir. Dec. 27, 2021) (quoting *Nachsin v. AOL,

11  LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)). "It is well established in this circuit that district courts

12  may approve settlements with *cy pres* provisions that affect only a portion of the total settlement

13  fund." *Id.* "*Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the

14  objectives of the underlying statutes, and the interests of the silent class members, including their

15  geographic diversity." *Nachshin*, 663 F.3d at 1036.

16      The court previously acknowledged but did not rule on the parties' proposed *cy pres*

17  distribution.  (Dkt. No. 134 at 6.)  The Parties have agreed that any funds from checks that remain

18  uncashed by Non-California Eligible Plaintiffs who submit a Claim Form but fail to cash checks

19  shall be distributed to the National Employment Law Project ("NELP").  (Dkt. No. 115-1 at §

20  2.8(i)(2); Dkt. No. 129 at ¶ 10.)   NELP's work and interests align closely with those of Non-

21  California Eligible Plaintiffs. *See Shanahan v. KeyBank*, No. 1:19-cv-02477-PAB, 2021 WL

22  1034403, at *5 (N.D. Ohio Mar. 16, 2021) (approving NELP as the cy pres recipient and finding

23  that "NELP's 'interests reasonably approximate those being pursued by' Class Members as its

24  nationwide mission of, inter alia, strengthening protections and support for lowwage workers is in

25  line with the broad humanitarian and remedial purpose of the FLSA.") (citation omitted). NELP is

26  also an appropriate cy pres recipient because its work is nationwide.  (Dkt. No. 129 at ¶ 10.)

27  Finally, because Non-California Eligible Plaintiffs were required to submit a claim form with their

28  current address to participate and have thereby indicated their interest in receiving a check, Class

United States District Court
Northern District of California

8

1   Counsel anticipates that any distribution to NELP will be quite small.  (*Id*.)

2        The Court concludes that the *cy pres* proposal is fair and reasonable.

3   **III. Final Approval of the Settlement**

4        In determining whether a class action and FLSA collective settlement is fair, adequate, and

5   reasonable, determination, courts generally consider the following factors: "(1) the strength of the

6   plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the

7   risk of maintaining class action status throughout the trial; (4) the amount offered in settlement;

8   (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and

9   views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class

10  members to the proposed settlement." *Churchill*, 361 F.3d at 575; *see also Otey*, 2014 WL

11  1477630, at *4 (applying same factors to FLSA collective action settlement). "This list is not

12  exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson*

13  *Elec. Power Co*., 8 F.3d 1370, 1376 (9th Cir. 1993). However, when "a settlement agreement is

14  negotiated prior to formal class certification, consideration of these eight ... factors alone is

15  [insufficient]." *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011). In

16  such cases, courts must also ensure that the settlement did not result from collusion among the

17  parties. *Id*. at 946-47.  As discussed below, a review of the fairness and *Bluetooth* factors indicates

18  that the settlement is fair, adequate, and reasonable.

19       **A. The Fairness Factors**

20            **1. Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely**

21                 **Duration of Further Litigation**

22       The Court first considers "the strength of [Plaintiffs'] case on the merits balanced against

23  the amount offered in the settlement." *See DIRECTV*, Inc., 221 F.R.D. at 526 (internal quotation

24  marks and citation omitted). Although these actions reached settlement before the Court had

25  occasion to consider the merits of Plaintiffs' claims, the Court need not reach an ultimate

26  conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in

27  litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."

28  *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th

United States District Court
Northern District of California

Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id.* (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*

Plaintiffs contend that Defendants incorrectly misclassified California Appraisers as exempt employees and thereby deprived them of compensation for overtime, missed meal and rest breaks, accurate wage statements, all wages twice per month and upon termination, and other guarantees under the FLSA and California law. (Dkt. No. 115, Ho Prelim. Decl. ¶ 20.) While Plaintiffs maintain that they would likely prevail at trial, Class Counsel concedes that they faced significant risks with continued litigation, including the possibility of losing a motion for class certification and the difficult burden of proving the amount of overtime work. (*Id.* ¶¶ 34-35.) Further, if the actions had not settled, Plaintiffs faced a lengthy period of discovery, class certification, motions for summary judgment, and trials. (*Id.* ¶ 36.) Such extensive litigation would be costly, time-consuming, and uncertain, and even if Plaintiffs prevailed at trial of these actions, an appeal would likely follow. (*Id.*)

Given the risks and costs of continued litigation, the immediate reward to class members through settlement is preferable. The average payout for California Class Members who did not opt in to the FLSA claim is $15,166.31 and the average payout for California Class Members who did opt in is $16,765.59. (Dkt. No. 154 at ¶ 14.) Non-California Opt-In FLSA plaintiffs will receive between $3,968.84 and $4,684.20. (*Id.*) The benefit of receiving this money now rather than later at some unidentified and uncertain time has its own value. Thus, the challenges Plaintiffs would face should this case move forward instead of settling, in contrast to the finality and speed of recovery under the Agreement, weigh in favor of approving the settlement.

### 2. Settlement Amount

The amount of recovery offered also favors final approval of the settlement. When

United States District Court
Northern District of California

United States District Court
Northern District of California

considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc*., 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (collecting cases).

The Settlement Administrator estimates that Defendants are obligated to fund $3,876,130.59 of the maximum $4.9 million settlement fund (without the employer's share of payroll taxes). (Dkt. No. 154 at ¶ 7.)  Of this amount, $2,110,797.25 will go to individual settlement awards (and an additional estimated $107,203.12 will be paid by Defendants towards payroll taxes).  (*Id*. at ¶ 8.)  Defendants are obligated to fund the entirety of the settlement allocated to *Dixon I* California Class Members with no reversion, and the full allocation is being paid out to those Class Members, regardless of whether they submitted a FLSA Claim Form. (*Id.* at ¶ 9.)  Defendants are not required to fund the portion of the settlement allocated for the 267 non-California Opt-In Eligible Plaintiffs who did not opt in by submitting a claim form[1].  (*Id*. at ¶¶ 7, 10.)  These individuals will not receive a payout under the settlement nor will they be bound by its terms.  (*Id.* at ¶ 12.)

The estimated distribution for the California Class Members who did not opt into the FLSA claim is approximately 5.98% of the maximum exposure for that group's claims, while the estimated distribution for California Class Members who did opt-in is about 11.44% of the maximum exposure of that group's claims. (Dkt. No. 129-5.) The gross settlement fund with a maximum of $4.9 million is an estimated 8% of the total maximum recovery. (Dkt. No. 115 ¶ 37.) In granting preliminary approval the Court concluded that the estimated payout to class members was fair in relation to the risks of continued litigation, (*see* Dkt. No. 134 at 21-23), and there is nothing in the final approval materials that changes the Court's analysis on that score.

As noted above, none of the individuals eligible to op-out or object to the settlement—all of the California class and collective members—chose to opt out or object.  Thus, that "the

---

[1] Prior to the settlement being reached, 20 non-California employees filed FLSA opt in notices. They did not have to submit a claim form.

United States District Court
Northern District of California

overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), overruled on other grounds by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Court therefore concludes that the amount offered in settlement also weighs in favor of final approval.

### 3. Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros*, 303 F.R.D. at 371. The Court's Preliminary Approval Order discussed Class Counsel's investigation of Plaintiffs' claims, exchange of discovery with Defendants, review of pay data, job descriptions and pay policy documents, participation in private mediation with an experienced mediator, negotiation with Defendants, and Defendants' asserted defenses and the value of Plaintiffs' claims. (Dkt. No. 134 at 15-16.) The Court determined that "the fact that the parties engaged in extensive discovery, participated in three mediations with experienced mediators, and obtained conditional certification of the FLSA classes pre-settlement all indicate that Plaintiffs were well-informed about the cases and their strengths and weaknesses prior to entering into the Settlement Agreement." (*Id.* at 17.) The Court affirms that preliminary determination and finds that the extent of discovery and stage of proceedings support approval of the settlement.

### 4. Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. The settlement Class Members have been represented by attorneys who have extensive experience serving as Class Counsel in cases like this one and have well-recognized expertise in both the substance of wage and hour claims and the procedure of class and collective actions. (Dkt. No. 115, Ho Prelim. Decl. ¶¶ 48-51; Dkt. No. 116, Aaron Prelim Decl. ¶¶ 26-30; Dtk. No. 117, Meireles Decl. ¶¶ 5-13.) Class Counsel strongly supports approval of this Settlement. (Dkt. No.

115 ¶ 25.)

Class Counsel's experience in wage-and-hour litigation and their assertion that the settlement is fair, adequate, and reasonable supports final approval of the settlement. *See Hanlon*, 150 F.3d at 1026; *see also DIRECTV, Inc*., 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotation marks and citation omitted).

### 5. Presence of a Government Participant

No government entity is a party to this action; however, because Defendants removed the *Dixon I* action pursuant to CAFA, the relevant state and federal officials had to be notified of the settlement pursuant to 28 U.S.C. § 1715(b). *See Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co*., 844 F.3d 1133, n.2 ("In addition to §§ 1332(d) and 1453, CAFA also includes §§ 1711-1715, which relate to approval of settlements in class actions."). The Settlement Administrator provided such notice on September 17, 2021.  (Dkt. No. 139 at ¶ 10.)  Further, Plaintiffs submitted written notice of Defendants' alleged wage-and-hour violations to the California Labor and Workforce Development Agency ("LWDA") in accordance with PAGA. ((Dkt. No. 142, Ho Final Decl. ¶ 8.)  No government entity had raised an objection to the proposed settlement.

### 6. Reaction of Class Members

As previously discussed, the Settlement Administrator attests that 475 class and collective members were mailed notice of the settlement, and notice was ultimately unsuccessful as to only 4 individuals. (Dkt. No. 139 ¶ 4-6.)   As of the date of this Order, no Class Members have opted out of the settlement and the Court received no objections concerning the settlement or Plaintiffs' motion for attorneys' fees. "Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Garner v. State Farm Mut. Auto. Ins. Co*., No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (internal quotation marks and citation omitted). Thus, the Court "may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Id.* (internal quotation marks and citation omitted).

1    In sum, the fairness factors weigh in favor of granting Plaintiffs' motion for final approval

2    of the class action and FLSA collective settlement.

3         **B. The *Bluetooth* Factors**

4         Given that the parties settled prior to class certification, the Court must look beyond the

5    *Churchill* fairness factors and examine the settlement for evidence of collusion with an even

6    higher level of scrutiny. *See Bluetooth*, 654 F.3d at 946. The question here is whether the

7    settlement was the result of good faith, arms-length negotiations or fraud and collusion. *See id*. In

8    determining whether the settlement is the result of collusion, courts "must be particularly vigilant

9    not only for explicit collusion, but also for more subtle signs that class counsel have allowed

10   pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id*.

11   at 947. The Ninth Circuit has identified three such signs:

12            (1) when counsel receive a disproportionate distribution of the
13            settlement, or when the class receives no monetary distribution but
              class counsel are amply rewarded;

14            (2) when the parties negotiate a "clear sailing" arrangement providing
15            for the payment of attorneys' fees separate and apart from class funds,
              which carries the potential of enabling a defendant to pay class
16            counsel excessive fees and costs in exchange for counsel accepting an
              unfair settlement on behalf of the class; and

17            (3) when the parties arrange for fees not awarded to revert to
18            defendants rather than be added to the class fund.

     *Id*. at 947 (internal quotation marks and citations omitted).

19
20        For the first *Bluetooth* factor, the Court compares the payout to the class (actual and

21   expected) to class counsel's unopposed claim for fees. *See Harris v. Vector Mktg. Corp*., No C-08-

22   5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011) (examining "whether a

23   disproportionate part of the settlement is being awarded to class counsel" under the settlement

24   agreement). The Settlement Agreement called for a common fund of up to $4.9 million; however,

25   because only 100 of the 367 Non-California Opt-In eligible employees submitted a claim form and

26   thus opted in, Defendants are only obligated to fund $2,110,797.25 of this amount.  The

27   Settlement Agreement provides for a maximum award of one-third of the available common fund,

28   or $1,633,333.33, as attorneys' fees.  (Dkt. No. 115-1 at § 2.8(d).)  This percentage alone may be a

sign of collusion. *See Bluetooth*, 654 F.3d at 947.  However, given that the fees requested represent a negative multiplier of approximately .91 on Class Counsel's lodestar (Dkt. No 142 at ¶ 15), the Court finds that while the high percentage is a red flag, it does not raise a concern regarding collusion.  Further, at the time Plaintiffs' counsel negotiated for the opportunity for the eligible non-Californians to opt in to the FLSA claim, counsel did not know how many would opt in and thus what the ratio would be.

The second warning sign—a "clear sailing" provision—is also present here. A clear sailing arrangement provides "for the payment of attorney's fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[.]" *Bluetooth*, 654 F.3d at 947 (internal quotation marks and citation omitted). Thus, the Court "has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid unreasonably high fees simply because they are uncontested." *Id*. (internal quotation marks and citation omitted). However, the Settlement Agreement does not appear to be an example of Defendants agreeing to pay Class Counsel excessive fees and costs in exchange for accepting an unfair settlement for the Class given that amount of fees sought is a less than counsels' lodestar and the actual payout to Class Members is significant. Thus, the clear sailing provision, though a *Bluetooth* warning sign, does not signal collusion under the circumstances presented here.

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d at 948—is not present here. If the Court awards Plaintiffs' counsel less than $1.66 million, the difference between what is awarded and the $1.63 million is paid pro rata to the participating collective and class members.

Accordingly, notwithstanding the existence of two *Bluetooth* red flags in varying degrees, the Court finds that the Settlement Agreement did not result from, nor was it influenced by, collusion. Instead, the Settlement Agreement adequately satisfies the Class Members' claims.

United States District Court
Northern District of California

* * *

The Court is satisfied that the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. There are no objections to address. Accordingly, the Court grants final approval of the Settlement Agreement.

**IV. Motion for Attorneys' Fees, Costs, and Class Representative Incentive Award**

As previously discussed, the Settlement Agreement provides that "Plaintiffs' Counsel will be paid up to one-third of the Total Settlement Fund, which equals $1,633,333.33 for attorneys' fees ("Attorneys' Fees")." (Dkt. No. 115-1 at § 2.8(d).) The Settlement Agreement further provides for reimbursement of Class Counsel's litigation expenses up to $60,000, and settlement administration costs of up to $20,000. (*Id*. at § 2.8(d), 2.8(e).) Finally, the Settlement Agreement provides that the named Plaintiffs will receive a $10,000 incentive award each and the declarants will receive $2,000 each, subject to Court approval. (*Id*.)

**A. Attorneys' Fees**

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. Pro. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. In diversity actions such as this, state law applies to determine the right to fees and the method for calculating them. *See Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478-79 (9th Cir. 1995). Because Plaintiffs' underlying class claims are state law claims, the Court must apply California law on attorneys' fees. *See Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047 (9th Cir. 2002).

The California Supreme Court has held that courts have discretion to choose among two different methods for calculating a reasonable attorney's fee award. *See Laffitte v. Robert Half Int'l Inc*., 1 Cal. 5th 480, 504 (2016). The first is the "percentage method," where the fee is calculated "as a percentage share of a recovered common fund or the monetary value of [the] plaintiffs' recovery." *Id*. at 489. The second approach is "[t]he lodestar method, or more accurately the lodestar–multiplier method." *Id*. at 489. Under the lodestar method, the fee is calculated "by

multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate," then "increas[ing] or decreas[ing]" the lodestar figure based on "a variety of ... factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Id*. (citation omitted). "The choice of a fee calculation method is generally one within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts." *Id*. at 504. This approach aligns with the Ninth Circuit. *See Vizcaino*, 290 F.3d at 1047 ("Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method.").

Both the California Supreme Court and the Ninth Circuit recommend that whether a court uses the lodestar or percentage-of-recovery method, the court should perform a cross-check using the other method to confirm the reasonableness of the fee (e.g., if the percentage-of-recovery method is applied, a cross-check with the lodestar method will reveal if the amount requested is unreasonable in light of the amount of work done). *See, e.g., Bluetooth*, 654 F.3d at 944-45; *Laffitte*, 1 Cal. 5th at 504 ("A lodestar cross-check ... provides a mechanism for bringing an objective measure of the work performed into the calculation of a reasonable attorney fee.").

### 1. Percentage-of-Recovery Method

Plaintiffs request $1,633,333.33 in fees contending that this amount represents one-third of the "maximum common fund."[2] (Dkt. No. 135 at 10.)  While the actual common fund here is less than the maximum common fund, the Court concludes that it is reasonable to determine the fairness of the fee award with reference to the amount made available to the class, not just the amount actually paid in claims. *See Williams v. MGM-Pathe Commc'ns Co*., 129 F.3d 1026, 1027 (9th Cir. 1997).  The common fund included substantial amounts for eligible non-Californians

---

[2] The Settlement Agreement provides that "Plaintiffs' Counsel will be paid up to one-third of the Total Settlement Fund, which equals $1,633,333.33 for attorneys' fees ("Attorneys' Fees")" with the "Total Settlement Fund" defined as "the *maximum* sum of up of up to Four Million Nine Hundred Thousand Dollars ($4,900,000)."  (Dkt. No. 115-1 at § 2.8(d)§ 1.41(a) (emphasis added).)

17

who elected to opt in to the FLSA action.  Of the 287 eligible employees, 35% opted in (100 employees), a significant opt-in rate.  The nearly million dollars not paid from the common fund is a consequence of counsel negotiating substantial settlement payments.  As explained above, at the time of negotiating the settlement, Plaintiffs did not know how many eligible collective members would opt in.  Further, referencing the maximum common fund does not reduce the amount paid to the participating class and collective members.  In effect, Defendants agreed to pay a certain amount to participating class and collective members and up to $1.633 million in attorneys' fees. The failure of all of the eligible non-California employees to opt in (and thus Defendants do not have to pay them settlement proceeds) does not reduce the amount Defendants must pay to the participating class and collective members even if the Court awards the full amount of attorneys' fees sought.  In other words, the participating class and collective members are not themselves paying fees on the amounts that went unclaimed.  The Court will thus use the $4.9 million figure in its common fund analysis.

The Ninth Circuit uses 25 percent of the fund "benchmark" for awarding fees. *Bluetooth*, 654 F.3d at 942.  "An adjustment, either up or down, must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances."  *Reyes v. Experian Information Services, Inc.*, 856 Fed. Appx. 108, 110 (9th Cir. 2021) (cleaned up).  The Court finds that an upward adjustment for a fee award of 30% of the common fund is appropriate for several reasons.

First, cases with a relatively small fund of under $10 million will "often result in fees above 25%." *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008); *see also Alvarez v. Farmers Ins. Exch.*, No.14-cv-00574-WHO, 2017 WL 2214585, at *3 (N.D. Cal. Jan. 18, 2017) ("Fee award percentages generally are higher in cases where the common fund is below $10 million." (citing cases).

Second, as discussed above, there were no objections either to the settlement or the attorneys' fee award, and no requests to opt-out were received.

Third, Class Counsel achieved substantial results in this case. The settlement payments range from $3,968.84 for the Non-California Opt-In Eligible Plaintiffs to $16,765.59 for the

California FLSA Opt-In Class Members.  (Dkt. No. 154 at ¶ 14.)  The Court previously

determined that the relief provided for class and collective members is fair, adequate, and

reasonable, especially considering the risks associated with further litigation. (Dkt. No. 134 at 20-

23.)  The degree of success achieved in this case weighs in favor of awarding Class Counsel's

requested fees. *See Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.*, No. 19-CV-07087-

DMR, 2021 WL 4133860, at *5 (N.D. Cal. Sept. 10, 2021) (awarding 33% of the common fund in

fees where the FLSA class and collective settlement payments ranged from $3,799.16 to

$10,785.52)

Finally, as explained in the following section, a 30% award is supported by a lodestar

cross-check.

The Court declines to award the requested 33% of the available common fund because in

this case, unlike the cases Plaintiffs cite to support their 33% request (Dkt. No. 135 at 10-11), not

all of the common fund will actually be paid out; instead, Defendants are paying approximately

$3.8 million rather than $4.9 million.  Thus, the $4.9 million somewhat overstates the result

obtained as Defendants did not agree to  unconditionally to pay $4.9 million.

### 2. Lodestar Method

Class Counsel calculates its lodestar at $1,779,079.26.  (Dkt. No. 142 at ¶ 13.)  This

amount reflects 3,683.7 hours of work performed by three firms, which can be broken down as

follows:

- Goldstein, Borgen, Dardarian & Ho: 1,707.4 hours of work for a lodestar of
  $897,965.18 (Dkt. No. 136 at ¶ 21(l); Dkt. No. 142 at ¶¶ 12-13);

- Outten & Golden LLP: 1,574.1 hours of work for a lodestar of $689,508.58 (Dkt.
  No. 137 at ¶ 39; Dkt. No. 143 at ¶¶ 15-16); and

- Shavitz Law Group, P.A. 402.2 hours of work for a lodestar of $191,605.50 (Dkt.
  No. 138 at ¶ 19.)

These lodestars each reflect an 5% across-the-board discount in the exercise of billing judgment.

(Dkt. No. 142 at ¶ 13.)

"Affidavits of the plaintiff['s] attorney and other attorneys regarding prevailing fees in the

United States District Court
Northern District of California

1    community, and rate determinations in other cases, particularly those setting a rate for the

2    plaintiff['s] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers*

3    *of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). The rates requested in this case

4    are within the range of other rates approved in wage and hour litigation in this district.  *See Joh v.*

5    *Am. Income Life Ins. Co.*, No. 18-CV-06364-TSH, 2021 WL 66305, at *8 (N.D. Cal. Jan. 7, 2021)

6    (collecting cases approving similar rates).  Further, Class Counsel's rates have been approved by

7    other courts in this district.  *See, e.g., Lashbrook v. City of San Jose*, No. 5:20-cv-01236-NC, Dkt.

8    No. 25 (N.D. Cal. Sept. 2, 2020), (finding that Goldstein, Borgen, Dardarian & Ho's 2020 hourly

9    rates were "within the market range of hourly rates charged by attorneys of comparable

10   experience, reputation, and ability for similar litigation"); *del Toro Lopez v. Uber Techs., Inc.*, No.

11   4:17-cv06255-YGR, 2018 WL 5982506, at *4 (N.D. Cal. Nov. 14, 2018) ("[Outten & Golden

12   LLP's] hourly rates, ranging from $250 to $850 for attorneys, are reasonable in light of the market

13   for legal services of this type and quality."); *Lawson. v. Love's Travel Stops & Country Stores*,

14   Inc., No. 1:17-cv-01266-CCC-MCC, 2021 WL 720359, at *5-6 (M.D. Pa. Feb. 24, 2021)

15   (approving attorney fee request based on rates of $750/hour, $575/hour, and $400/hour, for Gregg

16   I. Shavitz, Paolo C. Meireles, and Logan A. Pardell, respectively).  While the Court need not and

17   does not decide that the exact rates requested by counsel are reasonable, they are at least within the

18   range of reasonableness required to use the lodestar figure as a cross check. *See Joh*, 2021 WL

19   66305, at *7 ("Where a lodestar is merely being used as a cross-check, the court may use a rough

20   calculation of the lodestar." (internal quotation marks and citation omitted)). The reported hours

21   spent litigating this case are also not plainly unreasonable.

22        The requested one third fee award of $1,633,333.33 is approximately .92 of the reported

23   $1,779,079.26 lodestar.  "A negative multiple 'strongly suggests the reasonableness of [a]

24   negotiated fee.'" *Moreno*, 2021 WL 4133860, at *6 (quoting *Rosado v. eBay Inc.*, No. 5:12-cv-

25   04005-EJD, 2016 WL 3401987, at *8 (N.D. Cal. June 21, 2016)).  Thus, 30% is even a more

26   reasonable amount.

27                                              ***

28        In sum, both the percentage-of-recovery and the lodestar analyses support a fee award of

1   $1,470,000.

2   **B. Costs**

3        "There is no doubt that an attorney who has created a common fund for the benefit of the

4   class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v.*

5   *Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted).

6   Plaintiffs request $60,000 in litigation costs and $20,000 in settlement administration costs. (Dkt.

7   No. 136 at ¶ 28; Dkt. No. 137 at ¶ 52; Dkt. No. 138 at ¶ 26; Dkt. No 139 at ¶ 11.)  These costs are

8   all well documented and reasonable. (*Id*.) Accordingly, the Court awards $80,000 in combined

9   litigation and settlement administration costs.

10   **C. Incentive Awards**

11        "Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp*.,

12   563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the

13   latter of which are "entered into as part of the initial retention of counsel" and "put class counsel

14   and the contracting class representatives into a conflict position from day one"). However, the

15   decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp.*

16   *Sec. Litig*., 213 F.3d 454, 463 (9th Cir. 2000). Incentive awards "are intended to compensate class

17   representatives for work done on behalf of the class, to make up for financial or reputation risk

18   undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private

19   attorney general." *Rodriguez*, 563 F.3d at 958-59. Although incentive awards are viewed more

20   favorably than incentive agreements, excessive awards "may put the class representative in a

21   conflict with the class and present a considerable danger of individuals bringing cases as class

22   actions principally to increase their own leverage to attain a remunerative settlement for

23   themselves and then trading on that leverage in the course of negotiations." *Id*. at 960 (internal

24   quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all

25   incentive awards to determine whether they destroy the adequacy of the class representatives."

26   *Radcliffe v. Experian Info. Sols. Inc*., 715 F.3d 1157, 1164 (9th Cir. 2013).

27        In determining whether an incentive award is reasonable, courts generally consider:

28             (1) the risk to the class representative in commencing a suit, both

United States District Court
Northern District of California

financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co*., 901 F. Supp. 294, 299 (N.D. Cal. 1995)).  A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc*., 252 F.R.D. 652, 669 (E.D. Cal. 2008). Further, district courts must evaluate each incentive award individually. *See Staton*, 327 F.3d at 977.

Plaintiffs seek incentive awards of (1) $10,000 for the class representatives Ms. Dixon and Mr. Seltz, and (2) $2,000 for each individual who submit a declaration in support of certification of the FLSA collectives.  The Court addresses each request in turn.

### 1. Incentive Awards for Class Representatives

Plaintiffs maintain that incentive awards for the class representatives are appropriate given the "critical role [Dixon and Seltz] played in this case, and the time, effort, and risks undertaken in helping secure the result obtained on behalf of the settlement classes."  (Dkt. No. 141 at 23.)  Plaintiff Dixon attests that she spent approximately 30 hours working on this case since 2018 meeting with counsel, reviewing and collecting documents, reviewing the complaint, and participating in mediations.  (Dkt. No. 118 at ¶¶ 5-17.)  Plaintiff Dixon was a current employee at the time the case was filed and worried that she would lose her job by filing the case and that she would lose future employment opportunities because of her association with the case.  (*Id*. at ¶ 19.)  Plaintiff Seltz attests that he spent between 37-40 hours on this case since 2017 meeting with counsel, reviewing and collecting documents, reviewing the complaint, and participating in mediations.  (Dkt. No. 119 at ¶¶ 4-19.)   Plaintiff Seltz was and remains concerned that prospective employers may learn of his participation in the case which could lead to retaliation or otherwise impact his employment.  (*Id*. at ¶ 21.)

The Court is satisfied that the class representatives individual contributions to this case

warrants a service award; however, the requested amount—$10,000—exceeds the amount deemed

presumptively reasonable in the Ninth Circuit. *See Lopez v. Bank of Am., N.A.*, No. 10-cv-01207-

JST, 2015 WL 5064085, at *8 (N.D. Cal. Aug. 27, 2015) (noting that service awards of $5,000 are

presumptively reasonable in the Ninth Circuit) (citing *Harris*, 2012 WL 381202, at *7 (collecting

cases)).  An excessively large service award can suggest that a plaintiff's financial interest in

seeking a settlement does not align with interests of the absent class members because the plaintiff

was "more concerned with maximizing [his own gain] than with judging the adequacy of the

settlement as it applies to class members at large." *See Staton*, 327 F.3d at 977. However, in the

Settlement Agreement Ms. Dixon and Mr. Seltz each agreed to a general release of all claims

"known or unknown, suspected or unsuspected, that they had, now have, or may hereafter claim to

have against Cushman" including all unknown claims covered by California Civil Code § 1542 in

the case of Ms. Dixon. (Dkt. No. 115-1 at § 2.8(e).) Thus, the scope of Plaintiffs' release as class

representatives exceeds that of other Class Members.

Accordingly, the Court concludes that a service award of $5,000 is reasonable. This award

reflects the amount deemed presumptively reasonable in this Circuit, and recognizes Ms. Dixon

and Mr. Seltz's release of any and all known and unknown claims against Cushman.

### 2. Incentive Awards for Declarants

As the Court noted in its preliminary approval order, it had concerns regarding Plaintiffs'

request for incentive awards for the six FLSA Opt-In declarants.  (Dkt. No. 134 at 18-19.)

Plaintiffs' motion for final approval does not assuage the Court's concerns.

First, the cases Plaintiffs cite are distinguishable and unpersuasive.  *See Rabin v.*

*PricewaterhouseCoopers LLP*, No. 16-CV-02276-JST, 2021 WL 837626, at *10 (N.D. Cal. Feb.

4, 2021) (finding that the "service awards for these declarants are reasonable because they will

*sign a general release* and because they have exposed themselves to potential retaliation from

future employers due to their association with the case.") (emphasis added); *Walton v. AT&T*

*Services, Inc.*, No. 15-3653-VC, 2018 WL 11376002, Dkt. No. 221 (N.D. Cal. Fe. 14, 2018)

(granting final approval using the parties' proposed order); *Mills v. Cap. One, N.A.*, No. 14 CIV.

1937 HBP, 2015 WL 5730008, at *18 (S.D.N.Y. Sept. 30, 2015) (analyzing the propriety of

1    incentive awards for class representatives and opt-in plaintiffs collectively without distinguishing

2    between the different types of participation).

3         Second, the declarants' declarations in support of their request for an incentive award all

4    contain similar generic language regarding their participation.  They attest they performed three to

5    six and a half hours of work on the case participating in telephone interviews with counsel,

6    reviewing documents, and preparing their respective declarations. (Dkt. No. 145, Blake Decl. at ¶

7    5; Dkt. No. 146, Dickerson Decl. at ¶ 4; Dkt. No. 147, Elliot Decl. at ¶ 4; Dkt. No. 148, Hix Decl

8    at ¶ 5; Dkt. No. 149, Pierno Decl. at ¶ 5; Dkt. No. 150, Simone Decl. at ¶ 4.)  An incentive award

9    of $2,000 would amount to an award of between $300 and $650 per hour of work performed by

10   these declarants.

11        Finally, paying individuals for providing declarations in support of a FLSA certification

12   motion creates inappropriate incentives.  *See In re Tableware Antitrust Litig.*, 484 F.Supp.2d

13   1078, 1079 (N.D. Cal. 2007) (noting that the court must ensure that the settlement "does not

14   improperly grant preferential treatment to class representatives or segments of the class").

15                                          ***

16        Accordingly, the Court awards $5,000 to class representatives Ms. Dixon and Mr. Seltz,

17   but no incentive award to the declarants.

18                                    **CONCLUSION**

19        For the reasons stated above, the Court GRANTS Plaintiffs' motion for final approval of

20   the parties' class action settlement. In addition, the Court GRANTS IN PART and DENIES IN

21   PART Plaintiffs' motion for attorneys' fees and costs; specifically, the Court awards the

22   following: $1,470,000 in attorneys' fees; $60,000 in litigation costs; $20,000 in settlement

23   administration costs; and $5,000 as an incentive award for each class representative.

24        In accordance with the Northern District's Procedural Guidance for Class Action

25   Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of

26   attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the

27   following, to the extent applicable:

28              The total settlement fund, the total number of class members, the total
                number of class members to whom notice was sent and not returned

United States District Court
Northern District of California

as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class

Counsel shall "summarize this information in an easy-to-read chart that allows for quick

comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-

read chart, on the settlement website." *See id*.

This Order disposes of Docket Nos. 135, 141.

**IT IS SO ORDERED.**

Dated: April 21, 2022

_____
JACQUELINE SCOTT CORLEY
United States District Judge